**Dennis L. BLACK HAWK, Plaintiff,**

v.

**Commonwealth of PENNSYLVANIA, et al., Defendants.**

No. 3:CV–99–2048.

United States District Court, M.D. Pennsylvania.

Sept. 25, 2002.

---

### *MEMORANDUM*

VANASKIE, Chief Judge.

Plaintiff Dennis L. Black Hawk filed this civil rights action, alleging that his First Amendment right to free exercise of religion was violated when the Pennsylvania Game Commission refused to grant him an exemption to a permit fee requirement for the possession of two black bears. It is believed that the black bears are sacred and give spiritual strength to Black Hawk, a Native American considered to be a "holy man" who conducts spiritual ceremonies for other Native Americans on his property with the two black bears. Defendants are Vernon Ross, the Director of the Pennsylvania Game Commission, Thomas R. Littwin, Frederick Merluzzi, Barry Hambley, and David E. Overcash.[1] Currently pending are defendants' motion for summary judgment, and plaintiff's motion for partial summary judgment.

---

1. The Court granted defendants Commonwealth of Pennsylvania and Pennsylvania Game Commission's Motion to Dismiss by Order of September 11, 2000. (Dkt. Entry 35.)

Because Frederick Merluzzi and Barry Hambley were not personally involved in the decision to deny Black Hawk a religious exemption, summary judgment shall be granted in favor of Merluzzi and Hambley as to all claims. Because the Pennsylvania Game Code contains individualized exemptions for secular purposes, but not religious ones, and defendants have not advanced a compelling reason to deny Black Hawk an exemption, summary judgment shall be granted to Black Hawk as to his claims for injunctive relief. Because Black Hawk's right to a religious exemption was not "clearly established" so that a reasonable person would know that denial of the exemption would violate the First Amendment Free Exercise clause, summary judgment is granted as to defendants' claim of qualified immunity from damages.

## I. BACKGROUND

Dennis Black Hawk is a Native American of Lenape descent. (Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶ 1.)[2] He has been adopted by elders of the Pine Ridge Oglala Lakota tribe, from whom he learned traditional spiritual beliefs, and by a family of the Seneca tribe, who taught him the spiritual beliefs of the Haudenosaunee or Iroquois Nations. (Id. at ¶¶ 6–8.) While on the Pine Ridge reservation in South Dakota, Black Hawk was "put on a path" to follow the "holy ways" and he is now considered a holy man by other Native Americans, able to communicate with Native American ancestors. (Id. at ¶¶ 15, 17–18.) He experienced recurring dreams about bears. The elders advised Black Hawk that this was a vision and that the people's spirituality would be lifted by the bears. (Id. at ¶ 22.) Therefore, Black Hawk acquired two black bears, Timber and Tundra, in 1994. These bears were blessed by the elders of the Lakota tribe and the Iroquois confederacies as spiritual helpers to Black Hawk and other Native Americans. (Id. at ¶¶ 23–25.)

In 1995, Black Hawk moved to Pennsylvania. He purchased 3.11 acres in Weatherly, Carbon County, Pennsylvania. (Def.Stat. of Material Facts, Dkt. Entry 53, at ¶¶ 1, 4.) Black Hawk's property contains a tipi that is used for prayer, an anipi lodge to cleanse the spirit, and a ceremonial burial ground. (Id. at ¶ 17; Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶¶ 9–11, 13.) Black Hawk conducts spiritual ceremonies on his property and Native Americans from across the country travel to Weatherly to participate in these ceremonies. (Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶¶ 14–15; Def.Stat. of Material Facts, Dkt. Entry 53, at ¶ 17.) The bears are an integral part of these ceremonies. Black Hawk and his fellow Native Americans believe that black bears are sacred because they protect the land and give

2. Much of the uncontradicted factual background can be derived from the parties' Statements of Material Facts (Dkt. Entries 53 and 58), filed in accordance with Local Rule of Court 56.1. Under Local Rule 56.1, a party moving for summary judgment must file a "separate, short and concise statement of material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." A party opposing a summary judgment motion must respond to the numbered paragraphs in the moving party's statement of material fact. Both the movant's and the opponent's statements of material facts must contain references to the record to support their respective assertions. "All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party."

Both parties have complied with Local Rule 56.1 and, accordingly, the parties' Local Rule 56.1 Statements will be cited where appropriate. For matters that are not admitted in the Local Rule 56.1 Statements, the appropriate part of the record that supports a factual assertion will be cited.

spiritual strength in religious ceremonies when physically present. (Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶¶ 19–21; Def.Stat. of Material Facts, Dkt. Entry 53, at ¶ 18.) To this end, participants in these ceremonies interact with the bears and the hair shed by the bears is used in Native American medicine bags. (Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶¶ 28–29.) Because Black Hawk's bears were found to be spiritual helpers, removal of the bears would be akin to taking the sacraments from a church. (*Id.* at ¶ 31.)

In Pennsylvania, the Pennsylvania Game Code, 34 Pa.C.S. §§ 2901–2965, governs the possession of black bears and other wildlife. (Def.Stat. of Material Facts, Dkt. Entry 53, at ¶ 23.) The Code includes certain substantive requirements that must be met for the Pennsylvania Game Commission ("Commission") to issue a wildlife ownership permit. For example, the Commission required Black Hawk to build a cage of specific dimensions for the bears. (Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶ 49.) Black Hawk complied with all the Commission's standards and was issued a permit between 1995 and 1999. (Def.Stat. of Material Facts, Dkt. Entry 53, at ¶ 33.)

A disagreement arose, however, regarding the annual permit fee of $200. The Commission collects fees for the permits it issues under the Code. The money collected from these fees is used by the Commission in administering and enforcing its regulations relating to activities which are governed by special permits, such as inspecting the facilities of owners of wild animals to insure that they comply with Commission regulations. (*Id.* at ¶¶ 31–32.) The fees themselves make up less than one percent of the Commission's revenues, which were projected to be $61.1 million for the 1999–2000 fiscal year, and the Commission issued over 30,000 permits in 2000. (Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶¶ 56–58.)

There are statutory exemptions from the fee requirement. The Commission may waive a permit fee for hardship or extraordinary circumstances if consistent with sound game or wildlife management activities or the intent of the Game Code. 34 Pa.C.S. § 2901(d). Excluded from the permit fee by statute are public zoological gardens that receive government grants or appropriations, private zoological parks or gardens that are open to the public and that are accredited by the American Association of Zoological Parks, and nationally recognized circuses. 34 Pa.C.S. § 2965(a)(1)–(3). The Commission also does not charge a fee for educational exhibits of wildlife. (Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶¶ 39–45.)

When Black Hawk moved to Pennsylvania in 1995, he paid $50 for a "menagerie" permit. In 1997, Black Hawk was required to obtain an exotic wildlife dealer's permit because Fred Merluzzi, the wildlife conservation officer for the area, believed that Black Hawk intended to breed the bears and sell their cubs. (Def.Stat. of Material Facts, Dkt. Entry 53, at ¶ 34–35.) Black Hawk had difficulty paying the fee, and was allowed to pay in two installments of $100. (*Id.* at ¶ 35.) Afterwards, Black Hawk requested an exemption from payment of the permit fee on the ground that he possessed the bears for Native American religious purposes. (Pl.Stat. of Material Facts, Dkt. Entry 53, at ¶ 35.) Specifically, he asked Merluzzi about his entitlement to an exemption based on his status as a Native American. Merluzzi made an inquiry with the Bureau of Indian Affairs and was told that Native Americans who possess a B.I.A. identity card are entitled to certain exemptions under some federal statutes. Black Hawk does not possess such a card. Merluzzi in-

formed Black Hawk of what he was told by the B.I.A. and did not forward Black Hawk's request to Harrisburg to be reviewed by the Commission's central office. (Def.Stat. of Material Facts, Dkt. Entry 53, at ¶ 36.) Black Hawk was also warned that if he did not pay the fee he could be prosecuted and the bears could be confiscated by the Game Commission. (*Id.*)

In 1998, Black Hawk informed Merluzzi that he was keeping the bears for religious purposes and that he was having financial difficulty paying the $200 permit renewal fee. Merluzzi told Black Hawk that Black Hawk would have to contact the Commission's central office in Harrisburg regarding his entitlement to an exemption from the permit fee requirement. Black Hawk again paid the permit fee. (*Id.* at ¶ 37.) In 1999, Black Hawk again told Merluzzi that he did not believe that he should have to pay the fee because of his Native American beliefs and because the fee would cause Black Hawk financial hardship. In August, Black Hawk wrote a letter to his state representative, Keith McCall, concerning this belief. This letter was forwarded to Vernon Ross, Executive Director of the Game Commission. (*Id.* at ¶¶ 38–39; Exhibit 6 to Def. Motion for Summary Judgment, Dkt. Entry 51.) In addition, other Native Americans sent letters and electronic correspondence on Black Hawk's behalf to Ross and Thomas Littwin, Bureau of Law Enforcement. (Overcash Deposition, Exhibits 12–13; Dkt. Entry 52; Pl. Statement of Material Facts, Dkt. Entry 58, at ¶ 36.) Ross requested that Littwin respond to Black Hawk's request for an exemption. (Pl. Stat. of Material Facts, Dkt. Entry 58, at ¶ 91.)

Dave Overcash, the Director of the Commission's Technical Services Division, reviewed Black Hawk's application for a waiver and discussed the application with his supervisor, Littwin. (*Id.* at ¶¶ 85–86, 90, 98–99.) Black Hawk received a letter dated October 6, 1999, written by Overcash and signed by Littwin, informing Black Hawk that there was no exemption from the permit fee requirement for Native Americans. The letter informed Black Hawk that § 2901(d) of the Code provides for a waiver of the permit fee based on hardship when consistent with game or wildlife management activities.[3] The letter stated that Black Hawk would not qualify for this waiver. (Def.Stat. of Material Facts, Dkt. Entry 53, at ¶ 40.) The Commission considers the keeping of live animals in captivity as being inconsistent with sound game and wildlife management, or the overall purpose of the Game Code. (*Id.* at ¶ 42.) The only exception is where an animal is kept in captivity with the intent of reintroducing those animals into the wild. Black Hawk's bears were declawed and kept in captivity for their entire lives. They could not be released into the wild. (*Id.* at ¶¶ 42–43.) Thus, in the Commission's view, Black Hawk would not be entitled to an exemption regardless of his financial circumstances. Black Hawk was informed that his "permit has been expired since June 30, 1999 and if you have not disposed of the bears, you are in violation of the Game and Wildlife Code since that date and you are subject to prosecution." (Overcash Deposition, Exhibit 7).

Black Hawk responded to the letter by again requesting a waiver from the permit fee requirements. (Def.Stat. of Material Facts, Dkt. Entry 53, at ¶ 44.) In Novem-

---

**3.** Section 2901(d) of Title 34 of the Pennsylvania Consolidated Statutes provides for a waiver to the permit requirement. The section provides:

> Where hardship or extraordinary circumstance warrants, the director may waive

any of the requirements of this chapter and issue a permit without fee when it is consistent with sound game or wildlife management activities or the intent of this title.

ber, 1999, Merluzzi, after consulting Overcash and his supervisor, Barry Hambley, filed charges against Black Hawk for failure to renew his permit as required under § 2903 of the Game Code. Hambley authorized the filing of these charges based on Black Hawk's failure to pay the permit renewal fee. (*Id.* at ¶ 45.)

On November 24, 1999, Black Hawk, proceeding *pro se*, filed this action under 42 U.S.C. § 1983 alleging that his civil rights had been violated.[4] (Pl. Complaint, Dkt. Entry 1.) This Court issued a temporary restraining order on November 24, 1999, preventing the Game Commission from confiscating the bears pending the outcome of this suit.[5] (Dkt. Entry 5.) The Game Commission continued to pursue criminal proceedings. In February of 2000, a magistrate found Black Hawk guilty of the charges brought by the Game Commission. (Def.Stat. of Material Facts, Dkt. Entry 53, at ¶ 46.) Black Hawk filed an appeal to the Court of Common Pleas of Carbon County, which has stayed the prosecution pending the outcome of this case. (*Id.*)

## II. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194, 197 (3d Cir.), *cert. denied,* 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988); *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

---

**4.** By Order entered on January 26, 2000, Black Hawk's motion for appointment of counsel was granted. (Dkt. Entry 16.)

**5.** The defendants notified this Court that they did not oppose the continuation of the tempo-

rary restraining order pending the outcome of the case. Therefore, this Court issued an Order continuing the temporary restraining order. (Dkt. Entry 6.)

the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

## B. *The First Amendment Claim*

The Free Exercise Clause of the First Amendment, made applicable to the States through the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), provides that "Congress shall make no law . . . prohibiting the free exercise of religion." Prior to 1990, the U.S. Supreme Court had held that laws which substantially burden a religious practice must be justified by a compelling state interest. *See, e.g., United States v. Lee*, 455 U.S. 252, 257, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) ("the state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding government interest"); *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest"); *Sherbert v. Verner*, 374 U.S. 398, 402–03, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (courts must consider whether there is some compelling state interest that justifies a substantial infringement of a First Amendment right).

In *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Court changed the standard for evaluating free exercise claims. In *Smith*, the issue before the Court was whether an Oregon statute criminalizing peyote use encompassed the use of peyote for religious purposes, thus permitting the state to deny unemployment benefits to a person dismissed from his or her job for such peyote use. *Id.* at 874, 110 S.Ct. 1595.

According to the Court, a State would be " 'prohibiting the free exercise [of religion]' if it sought to ban [physical acts] only when they are engaged in for religious purposes, or only because of the religious belief that they display." *Id.* at 877, 110 S.Ct. 1595. The Court declined to apply strict scrutiny, however, and held that the "[r]ight of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes' (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879, 110 S.Ct. 1595 (*citing United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982)). In other words, courts will apply rational basis scrutiny to a neutral law of general applicability which incidentally burdens religious practice.

The *Smith* Court recognized only limited exceptions in which strict scrutiny might still apply. In particular, the Court distinguished the *Sherbert* line of cases by stating that the *Sherbert* balancing test was developed in a context of "individualized governmental assessment of the reasons for the relevant conduct." *Id.* at 884, 110 S.Ct. 1595. Specifically, the Court stated that "where individualized exceptions from a general requirement are available, the government may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.;* see also *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *Bowen v. Roy*, 476 U.S. 693, 708, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (plurality opinion); *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 364 (3d Cir.), *cert. denied*, 528 U.S. 817, 120 S.Ct. 56, 145 L.Ed.2d 49 (1999).[6]

---

**6.** The Court also recognized an exception in   situations in which a generally applicable law

■ The permit fee requirement appears at first glance to be a "neutral law[ ] of general applicability." Section 2901(d) of Title 34 of the Pennsylvania statutes, however, provides that the permit fee requirement may be waived "where hardship or extraordinary circumstance warrants" when it is "consistent with sound game or wildlife management activities or the intent of this act." This statute requires the director to evaluate the justification for the exemption on a case-by-case basis and appears to qualify as a "system of individualized exemptions." The Commission, in evaluating Black Hawk's request, would necessarily have considered the nature of Black Hawk's "hardship or extraordinary circumstance" and deemed it unworthy of an exemption. The Commission had to make a value judgment.

Defendants argue that the director's discretion to grant such waivers is, even in cases of hardship, limited to waivers "consistent with sound game or wildlife management." Unless the "hardship" or "extraordinary circumstance" conforms with the Commission's view of what is "consistent with sound game or wildlife management," no exemption is available. Again, this means that the defendants made a value judgment—that the Commission's view of what constitutes "sound game or wildlife management" superseded the hardship imposed upon Black Hawk's religious practice. Even if the fee was set at an amount that Black Hawk could not afford, he would be compelled to "dispose" of the bears because maintaining them in captivity is not consistent with the Commission's view of "sound game or wildlife management." The Commission simply will not recognize an exemption from the permit requirement for religious purposes, even though it admits that removal of the bears "would be like taking the sacraments from a church." (Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶ 31.)

"Although *Smith* determined that there was no violation ... when a government seeks to enforce a law of general applicability, it left undisturbed the application of a strict scrutiny test to situations where there are 'individualized governmental assessment[s].' " *Cottonwood Christian Ctr. v. Cypress Redev. Agency,* 218 F.Supp.2d 1203, 1222–23 (C.D.Cal.2002) (quoting *Smith,* 494 U.S. at 884, 110 S.Ct. 1595). Section 2901(d) calls for "individualized governmental assessment" of "hardship," "extraordinary circumstance," and "sound game or wildlife management activities." Thus, *Smith* does not control. Instead, strict scrutiny is to be applied to the decision to deny an exemption.

This conclusion is buttressed by consideration of Supreme Court precedent subsequent to *Smith* and the Third Circuit's interpretation of that case law. In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the Court reviewed municipal ordinances which restricted the "unnecessar[y]" slaughter of animals. While the ordinance appeared neutral and generally applicable on its face, it was used to prohibit animal sacrifices by followers of the Santeria religion. The ordinance contained so many specific exceptions for secular killings that, in practice, the only animal slaughters that were prohibited were those for religious reasons. The Court struck down the ordinance because it: "represents a system of individualized governmental assessment of the reasons for the relevant conduct.... Respondent's application of the test of necessity devalues religious reasons for killing by judging

involved not only the Free Exercise clause, but also some other constitutional protection.

*Smith,* 494 U.S. at 881, 110 S.Ct. 1595.

them to be of lesser import than nonreligious reasons. Thus religious practice is being singled out for discriminatory treatment." *Id.* at 537–38, 113 S.Ct. 2217.

The Third Circuit Court of Appeals has read *Lukumi* as extending strict scrutiny to governmental regulations that contain exceptions for secular reasons, but not for religious purposes:

> While the Supreme Court did speak in terms of "individualized exemptions" in *Smith* and *Lukumi*, it is clear from those decisions that the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations. If anything, *this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection.*

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,* 170 F.3d 359, 365 (3d Cir.1999) (emphasis added).

In the present case, it seems clear that the legislature has, in fact, created such categorical exemptions. Public zoological gardens, private accredited zoological gardens, and nationally recognized circuses are specifically excluded from the permit fee requirement by statute. 34 Pa.C.S. § 2965(a)(1)–(3). In addition, the Commission does not charge permit fees for educational exhibits. In effect, the state legislature has decided that these particular non-religious motivations for possessing wild animals are superior to religious motivations. That the Commission has never issued an exemption under one particular Code provision, § 2901(d), is not relevant where categorical exemptions have been

imposed by the legislature elsewhere in the Code.

Defendants' attempt to limit the impact of *City of Newark* is unavailing. At issue in *City of Newark* was a police department requirement that all police officers be clean shaven. Plaintiffs were Sunni Muslims and their religion commanded that they wear beards. 170 F.3d at 360–61. The Third Circuit held that the department's policy violated the First Amendment because the policy contained exemptions for secular reasons and the department did not offer any substantial justification for refusing to provide similar treatment for officers who are required to wear beards for religious reasons. *Id.* at 364–67.

Defendants point to the Third Circuit's distinction between the medical exemption from the "no-beard" requirement in *City of Newark* and the prescription exception in *Smith.*[7] The court observed that the prescription exception in *Smith* did not undermine Oregon's interest in curbing use of illegal narcotics, whereas the medical exception in *City of Newark* did undermine the police department's interest in fostering a uniform appearance in its officers. 170 F.3d at 366. Defendants argue that the § 2901(d) exemption furthers the Commission's interest in "sound game or wildlife management activities." This might be true if the analysis were of § 2901(d) alone, but *City of Newark* suggests that the Court must consider all categorical exemptions, not merely one particular individualized exemption. *Id.* at 365. Excluding zoos and circuses from the permit fee requirement does not further an interest in "sound game or wildlife activity" any more than private possession of bears for religious purposes. Yet, the Pennsylvania General Assembly has made a policy deci-

7. The Oregon law prohibited the knowing or intentional possession of a "controlled substance" unless the substance had been pre-
scribed by a medical practitioner. *Smith,* 494 U.S. at 874, 110 S.Ct. 1595 (quoting Ore.Rev. Stat. § 475.992(4) (1987)).

sion that these "secular motivations" are worthy of exemption from paying the permit fee, while religious motivations are not.[8]

The Pennsylvania Game Code is not merely a "valid and neutral law of general applicability." Exceptions are granted by the defendants for a variety of non-religious reasons, but not for religious reasons. Secular concerns have been elevated over religious motivations. Because "individualized exceptions from a general requirement are available," the defendants' refusal to grant a waiver to Black Hawk is subject to strict scrutiny. *See City of Newark*, 170 F.3d at 366 ("[W]hen the government makes a value judgment in favor of secular motivations, but·not religious motivations, the government's ·actions must survive heightened scrutiny.") Defendants must demonstrate a compelling interest for refusing to grant religious exemptions and that the exemption system is the least restrictive means of achieving that interest.

Defendants spend much energy in contending that Black Hawk's religious practice is not "substantially burdened." It can be argued, however, that Black Hawk need not show a burden at all. Under some circumstances, if a law is not neutral and of general applicability, a plaintiff is not required to prove that his free exercise of religion has been substantially burdened. *See Rader v. Johnston*, 924 F.Supp. 1540, 1543 n. 2 (D.Neb.1996). If a law is not neutral on its face or in its application, it may be discriminatory. According to the Third Circuit:

> Applying such a burden test to non-·neutral government actions would make petty harassment of religious institutions and exercise immune from the protection of the First Amendment. A burden test is only necessary to place logical limits on free exercise rights in relation to laws or actions designed to achieve legitimate, secular purposes.

*Brown v. Borough of Mahaffey*, 35 F.3d 846, 849–50 (3d Cir.1994); *see also Lukumi*, 508 U.S. at 533–34, 113 S.Ct. 2217 ("The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause 'forbids subtle departures from neutrality' and covert suppression of particular religious beliefs.' "). One of the factors to consider when determining whether a law is neutral is whether it employs a system of exemptions. *See Bowen v. Roy*, 476 U.S. 693, 707, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (stating that "[i]f a state creates such a mechanism [of individualized exemptions], its refusal to extend an exemption to an

---

**8.** Defendants incorrectly analogize this case to *Adams v. Commissioner*, 170 F.3d 173 (3d. Cir.1999). *Adams* dealt with exemptions from penalty provisions under the Internal Revenue Code. Tax cases, however, have always been treated differently from other restrictions on religion. *See, e.g., Jimmy Swaggart Ministries v. Bd. of· Equalization of California*, 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (collection and payment of generally applicable sales and use tax did not impose constitutionally significant burden on organization's religious practices or beliefs, and thus free exercise clause did not require California to grant organization an exemption from tax); *Hernandez v. Comm'r*, 490 U.S..680, 700, 109 S.Ct.

2136, 104 L.Ed.2d 766 (1989) (affirming I.R.S.'s disallowance of charitable deduction of certain payments to petitioner's church, noting that "the guiding principle is that a tax 'must be uniformly applicable to all, except as Congress provides explicitly otherwise.' ") (quoting *U.S. v. Lee*, 455 U.S. 252, 261, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982)); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (holding that exemptions from state sales tax was not required for religious periodicals). The *Adams* court itself recognized this distinction: "The concept of 'individual exemptions'. in *Smith* is not the same as 'reasonable cause' in the I.R.C...." *Adams*, 170 F.3d at 181 n. 10.

instance of religious hardship suggests a discriminatory intent."); *City of Newark,* 170 F.3d at 365 ("[T]he Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under *Smith* and *Lukumi."); see also Lukumi,* 508 U.S. at 537–38, 113 S.Ct. 2217 ("Respondent's application of the ordinance's test of necessity devalues religious reasons for killing by judging them to be of lesser import than nonreligious reasons. Thus, religious practice is being singled out for discriminatory treatment."); *Rader v. Johnston,* 924 F.Supp. 1540 (D.Neb.1996) (holding that parietal rule was not neutral rule of general applicability in light of exceptions granted to over a third of the freshmen students). In this case, statutory exemptions are granted to several types of wildlife owners, ranging from the Busch Garden Zoo to Clyde Peeling's Reptiland. (Pl. Statement of Material Facts, Dkt. Entry 58, at ¶¶ 46–48.) Granting exemptions to these secular institutions, but not to religious ones, suggests that the denial of a religious exemption to Black Hawk is not a neutral decision. Black Hawk then need only show that the Commission lacks a compelling interest in denying such exemptions.

■ In any case, Black Hawk has demonstrated a "religious hardship." The Court in *Smith* held that "where individualized exceptions from a general requirement are available, the government may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith,* 494 U.S. at 884, 110 S.Ct. 1595. Black Hawk points to *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), as exemplifying the "religious hardship" he has endured. In *Murdock,* the City of Jeanette, Pennsylvania prohibited the sale of goods, wares and merchandise of any kind within the city by canvassing for, or soliciting without a license. *Id.* at 106–07, 63 S.Ct. 870. The Court held that the ordinance, which required all persons soliciting within the city to procure a license and pay a fee, was unconstitutional as applied to Jehovah's Witnesses. Their religion mandated that they proselytize through hand distribution of religious tracts. The Court held the regulation to be an impermissible burden on defendants' religion, reasoning that "[t]hose who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of the resources necessary for its maintenance." *Id.* at 112, 63 S.Ct. 870. *See also Follett v. Town of McCormick,* 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944) (striking as unconstitutional similar license fee where preacher was a resident of the town and earned his living selling religious treatises); *id.* at 577, 64 S.Ct. 717 ("The exaction of a tax as a condition to the exercise of the great liberties guaranteed by the First Amendments is as obnoxious as the imposition of a censorship or a previous restraint.").

■ The wildlife permit fee in question bears more than a passing resemblance to the permit fee in *Murdock.*[9] Both are

9. It is true that the economic impact on the "[i]tinerant evangelists" of *Murdock* is different from that on Black Hawk. The Jehovah's Witnesses in *Murdock* were literally priced out of evangelizing in Jeanette, whereas Black Hawk may have the resources to pay the fee. The Court in *Murdock,* however, stated that to focus on whether the tax, in fact, suppresses religious activity is to disregard the nature of the tax—"a flat tax imposed on the exercise of a privilege granted by the Bill of Rights," regardless of the financial status of the plaintiff. *Id.* at 112–13, 63 S.Ct. 870. "A state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Id.* at 113, 63 S.Ct. 870. The Court must focus on the burden to plaintiff's religion, rather than the burden to his pocketbook. Thus, defendants' assertions that Black Hawk can, in fact, pay the fee are irrelevant.

"fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenues." *Murdock,* 319 U.S. at 113, 63 S.Ct. 870. The issuance of both permits "is dependent on the payment of a license tax." As such, "it restrains in advance those constitutional liberties of ... religion and inevitably tends to suppress their exercise.... On their face they are a restriction of the free exercise of those freedoms which are protected by the First Amendment." *Id.* at 114, 63 S.Ct. 870.

■ Defendants attempt to distinguish *Murdock* by pointing to language in that case that appeared to except "a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." *Id.* at 113–14, 63 S.Ct. 870. Such a nominal fee cannot constitutionally burden religion. What defendants overlook, however, is that the ordinance in *Murdock* was a law of "general applicability." It was "fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenues." *Id.* at 114, 63 S.Ct. 870. In other words, it applied to all solicitors, commercial or religious. The permit fee at issue here does not apply to all possessors of wild animals, but contains categorical exemptions for specific secular motivations. The legislature has made an impermissible value judgment. Circuses that possess wild animals for the entertainment of the public need not pay the fee, but Black Hawk, who possesses similar animals for religious purposes, must pay the fee. This negates the persuasive value of the "nominal fee" exception in *Murdock.* The state's interest in defraying costs cannot be compelling when it specifically exempts large categories of persons from the requirement of paying the fee. *Cf. Nat'l Awareness Found. v. Abrams,* 50 F.3d 1159, 1167 (2d Cir.1995) ("The $80 fee is statutorily set and New York is *afforded no discretion* in

imposing the fee based on speech content.") (emphasis added).

It must also be reiterated that present ability to pay the permit fee ignores the fact that, in the Commission's view, Black Hawk is not entitled to an exemption regardless of the financial strain on his indisputably limited resources that the fee may create. Black Hawk is confronted with the loss of animals of paramount spiritual significance if he cannot muster the money to pay whatever fee is imposed. Viewed in this light, the permit fee system imposes a "religious hardship."

■ Analysis of least restrictive alternatives is unnecessary because defendants cannot demonstrate a compelling interest in refusing to grant a religious exemption. In *Sherbert,* the Court offered a definition of compelling interest: "It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '(o)nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation.'" 374 U.S. at 406, 83 S.Ct. 1790 (quoting *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945)); *see also Wisconsin v. Yoder,* 406 U.S. 205, 212, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("Only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.").

Defendants assert that Pennsylvania's interest in promoting the welfare and prosperity of wildlife populations is a compelling state interest. Also, they claim, uniform payment of the permit fee by Black Hawk and other individuals is important for the "financial integrity" of the Game Commission and its ability to perform its mission.

However, the Commission is obliged to grant exemptions to various permit holders, including zoos and circuses, and gratu-

itously exempts educational exhibits of wildlife. The Supreme Court has said that "a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547, 113 S.Ct. 2217 (quoting *Florida Star v. B.J.F.*, 491 U.S. 524, 541–42, 109 S.Ct. 2603, 105 L.Ed.2d 443 (Scalia, J., concurring in part and concurring in judgment) (1989)).

The facts also make clear that any actual harm suffered by the Commission and the State's interest in wildlife management will be slight. The Commission's annual revenues are more than $60 million, and permit fees make up less than one percent of that figure. (Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶¶ 55–57.) Moreover, this is the only request for an exemption that the Commission has received since 1995. (*Id.* at ¶ 59.) This case is not analogous to the need for uniform collection of sales and Social Security taxes. *See Hernandez v. Comm'r*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989); *Texas Monthly v. Bullock*, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989). The fiscal integrity of the Game Commission would not be undermined by allowing religious exemptions any more than it is undermined by statutory exclusions for zoos and circuses.

Also, Black Hawk has met the substantive permit requirements. But for the fee, the Commission would have granted him a permit for the bears. Black Hawk's possession of the bears does not conflict with the Commission's goal of maintaining a wild bear population of at least 8,000. (Pl. Stat. of Material Facts, Dkt. Entry 58, at ¶ 61.) Indeed, Black Hawk's bears could not be returned to the wild in any case as they have been declawed and have lived in captivity their entire lives. Their captivity is not inconsistent with the Commission's concern of overpopulation and increased contact between wild bears and humans. The defendants have not shown a compelling reason for its decision to deny an exemption in this case. On the contrary, it appears that maintaining the bears, who have been in captivity their entire lives, qualifies as an "extraordinary circumstance" that would not defeat the state's interest in sound game and wildlife management.

In short, Pennsylvania does not have a compelling interest in requiring Black Hawk pay the permit fee. Therefore, the denial of a religious exemption to the permit fee requirement, where a system of individualized exemptions exists, violates the Free Exercise clause of the First Amendment.

### C. *Proper Defendants*

■ In order to be personally liable under § 1983, the defendants must have participated in violating Black Hawk's rights, directed others to violate them, or had knowledge of and acquiesced in subordinates' violations. *See Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir.1995) ("In order to render [defendant] personally liable under section 1983, the [plaintiffs] must show that he participated in violating their rights, or that he directed others to violate them, or that he, as the person in charge . . . had knowledge of and acquiesced in his subordinates' violations."). In this case, Black Hawk's Amended Complaint defines his claim as follows: "Defendants' actions in denying Black Hawk a religious exemption from the permit fee violated his right to the free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution." (Amended Complaint at ¶ 21.) Thus, those persons who participated in the decision to deny Black Hawk a religious exemption may be subject to liability for damages. Defendants concede

that Overcash and Littwin were personally involved in the decision to deny Black Hawk an exemption. (Def.Stat. of Facts, Dkt. Entry 53, at ¶ 44.) They dispute, however, that Ross, Merluzzi, and Hambley can be held liable.

■ Ross was the Director of the Pennsylvania Game Commission. The record shows that he was aware of Black Hawk's request for an exemption and aware of the decision to deny it. Under the Code, Ross has the power to grant such an exemption. 34 Pa.C.S. § 2901(d). The Third Circuit has held that, in the case of supervisor liability, "[t]he necessary involvement can be shown in two ways, either 'through allegations of personal direction or of actual knowledge and acquiescence,' or through proof of direct discrimination by the supervisor." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir.1990) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988)). In this case, Ross had "actual knowledge" of the request and denial of the exemption and acquiesced in the decision. State Representative McCall wrote to Ross and Littwin regarding Black Hawk's situation. Ross received e-mails from Native Americans requesting an exemption for Black Hawk, and he directed Littwin to respond to Black Hawk's request. Ross had "actual knowledge" and acquiesced in the decision to deny Black Hawk an exemption and, therefore, was sufficiently involved to be held liable.

■ Defendants Merluzzi and Hambley, however, did not participate in the decision to deny Black Hawk an exemption. Merluzzi was the Wildlife Conservation Officer who dealt directly with Black Hawk with respect to the permits. Black Hawk points to the fact that Merluzzi twice failed to forward his request for an exemption up the chain of command. He has not shown, however, that the delay in forwarding the request for an exemption somehow caused his request to be denied. While Defendant Overcash consulted with Merluzzi regarding Black Hawk's request for an exemption, there is no showing that Overcash relied on Merluzzi. Finally, while Merluzzi filed a citation against Black Hawk for failing to pay the permit fee, Black Hawk does not claim that the filing of criminal charges violated his First Amendment rights.

Defendant Hambley was Merluzzi's supervisor in the regional office of the Game Commission. Merluzzi discussed Black Hawk's request for an exemption from payment of the permit fee with Hambley, at which time Hambley advised Merluzzi that there is no exemption for Native Americans. He also instructed Merluzzi to file criminal charges against Black Hawk for failure to pay the permit fee. There is no evidence, however, that Hambley was involved "in denying Black Hawk a religious exemption," the actionable conduct asserted in the Amended Complaint.

Neither Merluzzi nor Hambley "participated in violating" Black Hawk's rights, nor did they "direct[ ] others to violate them." They were not involved in the actual decision to deny Black Hawk a religious exemption from the permit fee requirement. At most, Merluzzi provided information on which Overcash and Littwin acted. Therefore, the Court will grant summary judgment for Merluzzi and Hambley.

### D. *Qualified Immunity*

■ The doctrine of qualified immunity protects government officials "performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Qualified immunity is not available for claims of equitable relief. *Wood v. Strickland,* 420 U.S. 308, 314 n. 6, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."). Defendants argue that they are entitled to qualified immunity as to Black Hawk's claim for damages because it was not "clearly established" that denial of a fee exemption would violate the First Amendment.

In *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) the Court delineated the "clearly established" standard as follows:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

As more recently articulated in *Hope v. Pelzer,* —— U.S. ——, ——, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002), "officials can . . . be on notice that their conduct violates established law even in novel factual circumstances." There is no need for prior cases involving " 'fundamentally similar' " or " 'materially similar' " facts. *Id.* The "salient question" is whether the state of the law at the time of the challenged conduct gave defendants "fair warning" that their action was unconstitutional. *Id.*

Consistent with Supreme Court precedent, the Third Circuit has adopted a "broad view of what constitutes an established right of which a reasonable person would have known." *Burns v. County of Cambria,* 971 F.2d 1015, 1024 (3d Cir. 1992). There need not be an exact match between the facts of the current case and a previous case. To require such a correspondence would allow government officials "one liability-free violation of a constitutional or statutory requirement." *Id.* at 1024 (quoting *People of Three Mile Island v. Nuclear Regulatory Comm'rs,* 747 F.2d 139, 144–45 (3d Cir.1984)).

Defendants admit that they did not consider constitutional precedents when they decided to deny Black Hawk an exemption. (Pl.Stat. of Material Facts, Dkt. Entry 58, at ¶ 68.) Yet, the standard for qualified immunity is an objective one. "The ultimate issue is whether, despite the absence of a case applying established principles to the same facts, reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." *Good v. Dauphin County Soc. Servs. for Children,* 891 F.2d 1087, 1092 (3d Cir.1989). Where the defense of qualified immunity is asserted, the plaintiff shoulders the initial burden of showing that the challenged conduct violated a clearly established constitutional right. *Sherwood v. Mulvihill,* 113 F.3d 396, 399 (3d Cir.1997). "The Supreme Court has directed that the right in question should be defined in a particularized and relevant manner, rather than abstractly." *Doe v. County of Centre, PA,* 242 F.3d 437, 454 (3d Cir.2001). The right in this case is the right of a person to be exempted from a permit fee to possess wildlife where the wildlife have spiritual significance and the state has granted exemptions from the fee for some limited secular reasons.

Black Hawk contends that "fair warning" was afforded by *Murdock* and *Follett,* and that *Smith* "made clear that it was not reducing the standard of scrutiny for neutral laws that admitted of individualized exceptions." (Pl. Brief in Opp. to Def. Summary Judgment Motion, Dkt. Entry 74, at 13.) While acknowledging that this case is not factually similar to any case

cited by the parties, Black Hawk asserts that the "nuanced fact differences" are not sufficient to support qualified immunity in this instance.

Far from being mere "nuanced differences," the facts of this case are not sufficiently alike those found in *Murdock* or *Follett* to say that a reasonable Game Commission official would know that the First Amendment compelled a permit exception. Both cases involved "substantial burdens," not only on the exercise of religious rights, but also on the freedom of speech and free press. Both Black Hawk and the defendants have argued the question of whether the permit fee imposes a "substantial burden" on his First Amendment rights. In this case, a reasonable person could have construed *Murdock*, as well as *Smith*,[10] as requiring a plaintiff to show a "substantial" burden on the exercise of religion, and could have concluded that the $200 fee did not impose such a burden. Qualified immunity is warranted where an official, based on the available information, concludes that the action taken is consistent with controlling principles. *See Good*, 891 F.2d at 1092. Because a reasonable official could have understood that a "substantial burden" was a prerequisite to a claim that the permit fee was unconstitutional and that Black Hawk had not shown such a burden, the defendants in this case are entitled to qualified immunity.

It is also noteworthy that defendants relied upon *Murdock's* observation that a nominal fee imposed to defray administrative costs could not unconstitutionally burden the exercise of religion. 319 U.S. at 113–14, 63 S.Ct. 870. A reasonable official

could conclude that the $200 fee in this case falls within this category.

Furthermore, while courts have sustained license fees on the nominal fee basis, *see, e.g., National Awareness Foundation, supra,* Black Hawk has not cited any case that considered the "individualized assessment" approach of *Smith* and *City of Newark* in the context of fee exemptions. And those cases that have considered either individualized assessments or categorical exemptions for secular-based reasons have dealt with obvious burdens on the exercise of religion, for example, requiring the plaintiff to do something proscribed by his or her religion like removal of facial hair in *City of Newark.* Here, by way of contrast, Black Hawk's payment of the fee does not violate religious tenets. He is not being compelled to do something proscribed by his religious beliefs, an obvious burden on the exercise of religion. This case involves application of the individualized exemption analysis suggested in *Smith* to an incidental burden on the exercise of religion. Black Hawk has not cited any controlling precedent that would have afforded fair warning to the defendants that cases such as *City of Newark* were applicable here.[11] While I believe that *City of Newark* is applicable in this context, I cannot say that this conclusion is so obvious that a reasonable Game Commission official would have arrived at the same conclusion. Accordingly, defendants' assertions of qualified immunity will be sustained.

## CONCLUSION

Judgment will be granted to defendants as to Black Hawk's damages claims, and to

---

**10.** Further clouding the issue is the fact that the Supreme Court used the term "religious hardship" in *Smith.* 494 U.S. at 884, 110 S.Ct. 1595. It is not clear that "religious hardship" means "substantial burden." A reasonable official could read *Smith* as re-

quiring a "substantial burden" even in a case involving individualized exemptions.

**11.** *City of Newark* was decided in March of 1999, about six months before the challenged action at issue here.

defendants Frederick Merluzzi and Barry Hambley as to all claims. Summary judgment will be granted to Black Hawk on his section 1983 claim for equitable relief. Defendants shall be enjoined from requiring Black Hawk to pay a permit fee for possession of his two black bears. An appropriate Order follows.

## ORDER

NOW, THIS 25 DAY OF SEPTEMBER, 2002, for the reasons set forth in the foregoing memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Dkt. Entry 50) is **GRANTED IN PART and DENIED IN PART.**

A. Defendants' motion is **GRANTED** as to the claim of qualified immunity.

B. Defendants' motion is **GRANTED** as to Frederick Merluzzi and Barry Hambley.

C. Defendants' motion is **DENIED** as to all other claims.

2. Plaintiff's Motion for Partial Summary Judgment (Dkt. Entry 56) is **GRANTED IN PART and DENIED IN PART.**

A. Plaintiff's Motion is **DENIED** as to the claims for damages.

B. Plaintiff's Motion is **DENIED** as to all claims against Frederick Merluzzi and Barry Hambley.

C. Plaintiff's Motion is **GRANTED** as to all other claims.

3. Defendants Vernon Ross, Thomas Littwin and David E. Overcash, and their successor, in their official capacities, are enjoined from requiring plaintiff to pay a permit fee for the possession of his black bears, Timber and Tundra.

4. The Clerk of Court is directed to enter judgment in accordance with the foregoing and to mark this matter **CLOSED.**[1]

---

1. Plaintiff, of course, may move for an award of attorneys' fees in accordance with the requirements of Fed.R.Civ.P. 54(d)(2).