**Dennis L. BLACK HAWK, Plaintiff,**

**v.**

**COMMONWEALTH OF PENNSYLVA-NIA, Pennsylvania State Game Commission, Vernon Ross, Thomas L. Littwin, and Frederick M. Merluzzi, Defendants.**

No. 3:CV–99–2048.

United States District Court,
M.D. Pennsylvania.

Aug. 24, 2000.

Thomas B. Schmidt, III, Pepper, Hamilton & Scheetz, Harrisburg, PA, Gary S. Gildin, Carlisle, PA, for Plaintiff.

Dennis L. Blackhawk, Weatherly, PA, pro se.

Howard G. Hopkirk, Office of Attorney General Litigation Section, Harrisburg, PA, for Defendants.

### MEMORANDUM

VANASKIE, Chief Judge.

At issue in this case is whether plaintiff Dennis L. Black Hawk, a Native American, is entitled to a preliminary injunction to restrain defendants from destroying his bear, which he has kept in captivity since it was a cub and which is a central component of his religious beliefs, because the bear bit two persons. Defendants, who

propose to destroy the bear to test it for rabies, rely upon a Pennsylvania Department of Health ("DOH") regulation that requires destruction of wild animals that bite humans. *See* 28 Pa.Code § 27.103(f)(2). Black Hawk, relying upon the fact that the regulation expressly authorizes the Secretary to grant exceptions to the general rule that all biting wild animals must be destroyed and tested for rabies, argues that defendants must show that destruction of the bear is in furtherance of a compelling state interest and be the least restrictive alternative available to protect public health. Because I find that Black Hawk has established a reasonable probability of prevailing on the merits in that defendants have not shown that destruction of the bear is the least restrictive alternative to advance its compelling interest in protecting public welfare, and the harm occasioned by the destruction of the bear would indeed be irreparable, I will grant his request for a preliminary injunction.

## I. *BACKGROUND*

### A. *Procedural History*

Black Hawk filed this civil rights action on November 24, 1999, alleging that defendants, the Pennsylvania State Game Commission, the Commonwealth of Pennsylvania, Vernon Ross, Thomas L. Littwin and Frederick M. Merluzzi, violated his First Amendment right to free exercise of religion by refusing to grant him an exemption to a permit fee requirement for the possession of two black bears, Timber and Tundra. Black Hawk contends that he is regarded as a "holy man" by other Native Americans and that the bears have spiritual significance. On November 24, 1999, I issued a temporary restraining order preventing the Game Commission from confiscating the bears for non-payment of the permit fee. Defendants thereafter consented to conversion of the temporary restraining order to a preliminary injunc-

tion.[1] A pretrial schedule was established for this case and the parties have been engaged in discovery.

On August 14, 2000, the Court was notified that Black Hawk's bear pens had been vandalized and the bears had escaped and bit two individuals before being captured. After being notified that the Game Commission sought to have the bears destroyed in order to conduct a rabies investigation, Black Hawk requested that this Court enjoin the Game Commission from destroying the bears. In an Order dated August 14, 2000, a temporary restraining order was granted and a hearing was scheduled to determine whether Black Hawk should be granted a preliminary injunction. Black Hawk was directed to request an exception from the DOH regulations requiring destruction in advance of the hearing. Black Hawk complied with this directive. The DOH summarily denied Black Hawk's request.

A hearing on the preliminary injunction motion was held on August 18, 2000. After ascertaining that the male black bear, Timber, was not involved in either biting incident, defendants were enjoined from euthanizing him. Therefore, the only remaining issue is whether the defendants should also be enjoined from destroying Tundra, the female bear.

### B. *Facts*

Black Hawk is Native American. Black Hawk's father was a member of the Lenape Indian tribe in Pennsylvania. Black Hawk has been adopted by both the Oglala and Houdenosaunee Indian tribes. In the Oglala tribe, Black Hawk is recognized as a holy man. Black Hawk acquired his two black bears, Timber and Tundra, in 1994. The bears were cubs when Black Hawk took them in. They have been raised in captivity since about the age of 4 months. Black Hawk claims a spiritual connection to the bears.

---

1. Black Hawk moved for appointment of counsel, which was granted by Order dated

January 26, 2000.

Black Hawk moved from Nebraska to Pennsylvania in 1995. Since that date, Black Hawk has maintained the bears in a pen located on a 3.11 acre lot in Weatherly, Pennsylvania.

The bears are an integral part of the Native American rituals and ceremonies which Black Hawk holds regularly on his property.[2] According to Black Hawk, in Native American tradition, bears are said to have strong spirits and they share this strength with him and with other Native Americans who worship at his home. Black Hawk's bears were blessed by the elders of the Oglala Tribe at the Pine Ridge Reservation in South Dakota as spiritual beings. The hair of the bears is used by other Native Americans for medicine bags.

Timber and Tundra are kept in a fully-enclosed pen which meets the regulatory requirements of the Pennsylvania Game Commission.[3] Initially, Black Hawk paid the Game Commission permit fee to maintain the bears in captivity. When he became unable to pay the fee, he requested an exemption from the fee requirement on the basis of the bears' importance to his religious beliefs. The Game Commission refused to grant an exemption and threatened to confiscate the bears. This litigation ensued. As noted above, a preliminary injunction was issued to preserve the status quo pending a decision on Black Hawk's First Amendment claim.

The status quo—Black Hawk maintaining custody of the bears—was shattered

on August 10, 2000. While Black Hawk was away from his residence that evening, an unknown intruder cut the lock that secured the bear enclosure and released the bears. That evening, Black Hawk's neighbor, Art Lithkousky, saw the female bear, Tundra, on his property. Lithkousky recognized the bear as belonging to Black Hawk because he saw it had been de-clawed. Lithkousky decided to try to lead Tundra to Black Hawk's property, which adjoined Lithkousky's. While Lithkousky was outside attempting to get Tundra to return home, the bear bit him on the leg.[4] Lithkousky immediately went into his house and called the Game Commission. When a Game Commission officer arrived, he located the male black bear, Timber, on Black Hawk's property, tranquilized it, and took the bear to a Game Commission facility.[5]

On Friday, August 11, 2000, the Game Commission received a second call stating that Tundra had been located near Black Hawk's property. Officers from the Game Commission arrived and tranquilized the bear. Believing that the bear had been sufficiently tranquilized, the Game Commission officers tried to roll the bear over onto its back. During this attempt, the bear bit Deputy Wildlife Conservation Officer Chris Simko on the wrist. Mr. Simko received two bite lacerations on the arm, which required five stitches. Tundra has also been sent to a facility maintained by the Game Commission.

2. Black Hawk has a teepee and a sweat lodge on his property in which Native American ceremonies are held. Native Americans from across the country have come to his residence to participate in the ceremonies and to see the two bears.

3. The pens are made out of a heavy duty chain link fence and are also covered on the top. Two locks were on the cage. The Game Commission had inspected the cage on numerous occasions prior to the incident in question and determined that the cage met state regulations.

4. Mr. Lithkousky testified that he was within one foot of the bear when he made a quick turn, at which time the bear bit him in his

right shin. Mr. Lithkousky yelped, and the bear let go of his leg. The bear made no attempt to otherwise attack him, or follow him into the house. According to Mr. Lithkousky, the bite did break the skin, but was not serious. He went to the hospital to get it x-rayed, and was told to wash the wound with soap and water. The Pennsylvania Department of Health later contacted him and advised him to get rabies shots.

5. At the hearing, Lithkousky was adamant that it was Tundra, the female bear, and not the male bear, which bit him.

The Game Commission intends to destroy the bears pursuant to a DOH regulation which provides:

> A wild animal that bites or otherwise potentially exposes a human to rabies shall be immediately destroyed and its head submitted to one of the state or county diagnostic laboratories for a rabies examination. Exception to the requirement of this paragraph may be granted by the Secretary or his representative.[6]

28 Pa.Code § 27.103(f)(2).

During a telephone conference conducted on August 14, 2000, Black Hawk was directed to request an exception to the destruction of his bears, as contemplated by 28 Pa.Code § 27.103(f)(2). In his request for an exception under the regulation, Black Hawk informed the DOH that the bears had been raised in captivity, were kept in a fully enclosed pen on his property, and were important to his religious practice. He also explained that the bears had never required veterinary care, that the bears had been healthy and did not eat meat. Furthermore, he notified the DOH that the bears had received rabies vaccinations annually.[7] In a letter dated August 17, 2000, DOH denied his request without explanation.

Since being bitten by the bear, both Mr. Lithkousky and Mr. Simko have begun rabies treatments.[8] Neither has suffered any adverse effects from the injections.

## II. DISCUSSION

In order to obtain a preliminary injunction, the plaintiff must show both (1) that he is likely to experience irreparable harm without an injunction, and (2) that he is reasonably likely to succeed on the merits. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir.2000). The irreparable harm requirement is met if the plaintiff "demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Id.* at 484–85.

Black Hawk has presented substantial evidence that the destruction of Tundra would result in irreparable harm. Black Hawk testified that the two bears have spiritual significance to him as well as the other Native American people who come to participate in Native American ceremonies involving the bears. These particular bears have been blessed by the elders of the tribe as spiritual beings. As Black Hawk explained, these two bears *together* have a spirituality which would be destroyed if either of the animals were killed by other than natural causes. Furthermore, the spirituality of these particular bears can not be replaced merely by obtaining other bears, for, as Black Hawk explained, not all bears have the same spiritual quality. Euthanizing Tundra would therefore result in an irreversible and noncompensable harm to Black Hawk and his ability to practice his religious beliefs.

---

**6.** According to the evidence presented at the preliminary injunction hearing, rabies is a fatal disease which can be contracted by any warm blooded mammal. Rabies is transmitted in the saliva. Accordingly, although an animal may have contracted the rabies virus, if the virus is not in the saliva of the animal, it will not be transmitted to another animal or human. Although bears can carry the rabies virus, there have been no reports of rabies in bears in Pennsylvania in recent years. Furthermore, there have been no instances in the United States of bears transmitting rabies to a human. It was also established that the rabies vaccine has proven to be completely effective when a human is promptly treated after being bitten by an animal. The last documented case of human rabies was in 1983.

**7.** Black Hawk has administered the rabies vaccinations. At the preliminary injunction hearing defendants established that the vaccine used by Black Hawk has not been shown to be efficacious in bears. It should also be noted, however, that there was no evidence that the vaccine is not efficacious in bears.

**8.** Mr. Lithkousky needs two more shots to complete the rabies series. Mr. Simko needs four more shots to complete the series..

The key question here, therefore, is whether Black Hawk has shown a reasonable likelihood of prevailing on his claim that destruction of Tundra would violate his First Amendment right to religious freedom. The Free Exercise Clause of the First Amendment, made applicable to the States through the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), effectively provides that the States "shall make no law ... prohibiting the free exercise of religion."

For purposes of this preliminary injunction proceeding, defendants do not contest Black Hawk's sincerity in his belief in the spirituality of the bears. Nor do defendants contest the fact that Black Hawk's beliefs are within the protection of the First Amendment free exercise clause. Furthermore, there does not appear to be any dispute at this time that euthanizing Tundra will substantially burden Black Hawk's religious practices.[9] Instead, the focus of the parties' arguments has been on the standard of review by which to assess the constitutionality of the proposed destruction of Tundra.

In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the Court framed the inquiry as to the applicable standard of review as follows:

In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. Neutrality and general applicability are inter-related, and ... failure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

The first sentence of the regulation at issue here is indeed a "neutral law of general applicability." The second sentence of the regulation, however, grants the Secretary of DOH the authority to except wild animals from destruction. Moreover, in testimony provided by Dr. Lurie of the DOH, factors pertaining to whether a wild animal should be destroyed following a biting incident were identified. Specifically, Dr. Lurie referred to the National Association of State Public Health Veterinarians, Compendium of Animal Rabies Prevention and Control 2000 (Def.Ex.5), which, in pertinent part, provides:

9. I recognize that there is a substantial question as to what constitutes a "substantial burden" on religious practices. In *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 449, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988), the Court suggested that "substantial burden" should be limited to government action that coerces individuals into violating their religious beliefs or penalizing religious activity by denying the affected individuals an equal share of rights, benefits and privileges enjoyed by others. In this case, whether the government is coercing Black Hawk into violating a religious belief is clouded by the fact that Tundra is presently in state custody. If Black Hawk had recaptured Tundra first and returned her to the pen on his property, then defendants would be attempting to coerce Black Hawk to hand over Tundra, in plain violation of his religious beliefs. Whether the distinction caused by the fact that the Game Commission confiscated Tundra, so that it is not attempting to coerce Black Hawk to relinquish her, has constitutional significance has not been addressed by the parties. At this stage of the case, on a preliminary injunction motion, it is sufficient to note that Black Hawk has presented a substantial issue as to whether the destruction of Tundra would satisfy the constitutional requirement of a substantial burden on his religious practices. *See Marxe v. Jackson*, 833 F.2d 1121, 1127–28 (3d Cir.1987) (strength of showing of irreparable harm may warrant preliminary injunction although likelihood of ultimately prevailing is not compelling); *Constructors Association of Western Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir.1978) (where strong showing of irreparable harm is made, preliminary injunction might be appropriate " 'even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required' ").

Prior vaccination of an animal may not preclude the necessity for euthanasia and testing if the period of virus shedding is unknown for that species. Management of animals other than dogs, cats, and ferrets depends on the species, the circumstances of the bite, the epidemiology of rabies in the area, and the biting animal's history, current health status, and potential for exposure to rabies.

This evidence suggests that destruction of animals other than dogs, cats and ferrets requires a case-by-case analysis of the probability that the animal is rabid. It thus appears that because the DOH regulation contemplates "an evaluation of the particular justification for the killing, this [regulation] represents a system of 'individualized governmental assessment of the reasons for the relevant conduct.'" *Church of the Lukumi*, 508 U.S. at 537, 113 S.Ct. 2217. The Supreme Court has held that "in circumstances in which individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of "religious hardship" without compelling reason.'" *Id.* (*quoting Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 884, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)). Accordingly, the burden in this case is on the defendants to demonstrate both a compelling reason for having denied Black Hawk's request for an exemption to the requirement that Tundra be destroyed and that defendants' proposed action is narrowly tailored to advance the governmental interest. *See Church of the Lukumi*, 508 U.S. at 531–32, 113 S.Ct. 2217 (ordinance regulating animal slaughter that required evaluation of the justification of the killing created a system of individualized exemptions that warranted strict scrutiny with respect to prohibition on animal sacrifices for religious purposes); *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir.1999) (police department order banning police officers from having beards but providing medical exemption subject to strict scrutiny), cert. denied, —— U.S. ——, 120 S.Ct. 56, 145 L.Ed.2d 49 (1999).

The defendants argue that the Commonwealth has an interest in protecting the public health and therefore must destroy any animal that is suspected of carrying rabies. Although the state generally does have a compelling interest in protecting the spread of rabies, the regulation in this case permits the Secretary to make exceptions to the destruction requirement. The DOH has failed to articulate *any* reason, let alone a compelling reason, why Black Hawk's request for an exception was denied and why this *particular* bear must be destroyed. In his request for an exception, Black Hawk explained the religious significance of the bears. He also provided information regarding the health and care of the bears. Rather than addressing any of these issues, the DOH issued a denial of his request without explanation. Furthermore, although the parties were apprised that the preliminary injunction hearing related to the DOH regulations, no one from the DOH testified at the hearing as to the purpose behind the exception, under what circumstances exceptions are granted, and why Black Hawk's particular exception request was denied.

■ The evidence offered by the defendants consisted of generalizations as to the nature of rabies in animals, and speculation as to whether this bear transmitted the rabies virus. However, mere speculation as to the general rabies risk associated with bears is not sufficient to establish a compelling interest in destruction of this *particular* bear, especially where the facts in the record show that Tundra is in good health, has been in captivity since she was four months old, is regularly vaccinated for rabies, does not eat meat, and has not evidenced any conduct consistent with being rabid. Furthermore, the evidence asserted at the hearing suggested that bears, in general, are unlikely to carry rabies. Although the defendants' witnesses testified as to rabies in bears in general,[10] the

10.   Such testimony included evidence that al-    though rabies vaccines do exist, and can be

testimony essentially confirmed Black Hawk's presentation that the incidence of rabies in bears is almost non-existent. Moreover, no defense witness testified that Tundra had been examined since her capture. Nor has any defense witness conducted an individual analysis of the factors for this particular bear to determine if destruction could be avoided because of the importance of the bear to Black Hawk's religious beliefs and because of the bear's history.

Recognizing, however, that notwithstanding defendants' failure to support the denial of Black Hawk's request that Tundra not be euthanized, protection of public health is indeed a compelling interest and that destruction of Tundra would advance that interest, irrespective of the low risk of rabies posed by her, I find that Black Hawk has provided a sufficiently strong case that destruction is not narrowly tailored to advance the government's interests in this case. Quarantine of domesticated animals suspected to have rabies is often employed as an alternative to destruction. Indeed, there is a recognized quarantine period for dogs, cats and ferrets. The fact that there is no recognized quarantine period for bears does not mean that quarantine should not be employed in this case. The record is clear that Black Hawk can maintain Tundra in his bear pen for an indefinite period of time. As defendants' bear biologist testified, Tundra has been human habituated and is food dependent. In other words, she is used to being in captivity and cared for by Black Hawk. Returning her to Black Hawk allows her to remain under observation for rabid behavior while isolating her from the public. In this manner, the public can be protected while preserving Tundra.

I also recognize that the interests of Mr. Lithkousky and Mr. Simko, the victims of the bear bites, are substantial. Both individuals, however, have already begun their series of rabies treatments. Rabies treatments are 100% effective in preventing rabies if given prior to the onset of the disease.[11] The only purpose to be served by now destroying Tundra would be to enable Mr. Lithkousky and Mr. Simko to avoid completing the battery of rabies inoculations. While I recognize the discomfort and inconvenience associated with having to undergo the rabies treatments, I am also cognizant of the fact that rabies' treatment is received by many persons. Under these circumstances, the inconvenience and discomfort are not sufficient to outweigh the First Amendment interests of Mr. Black Hawk.[12]

The bear biologist for the Game Commission testified that the area in which the bears currently are being kept by defendants is not suitable for long term care. Furthermore, the Game Commission has failed to offer any suggestions regarding long term care in the event this Court granted a preliminary injunction.[13] Accordingly, it would seem that the most suitable option for ensuring that the bear is quarantined from the general public is to return the bear to Black Hawk. The pen in which Black Hawk has kept the bears had been found by the Game Commission for the last five years to be suitable for holding the bears. Black Hawk testified

used on wild animals, it is unknown if such vaccines are effective in preventing rabies. Dr. Lurie and Dr. Kathio admitted that such vaccines are often used on zoo animals. The two doctors also stated that there are no known quarantine periods for rabies for bears, and that destruction of the wild animal is the only proven way to test for rabies.

11. Although the defendants argue that there are risks associated with the shots, the testimony of Dr. Lurie suggested that the only risk of the shots is an allergic reaction which would have occurred after the first inocula-tion. Neither Mr. Lithkousky nor Mr. Simko has experienced such a reaction to the treatment.

12. Significantly, neither of the victims has demanded that the bears be destroyed.

13. The Game Commission admitted that because of the prevalence of black bears, it would be unlikely that a zoological institution would be willing to take the bear. Furthermore, it is not in the public's best interest to release the bear into the wild.

that since the vandalism he has purchased a different lock for the pen which cannot be cut. Under these circumstances, defendants will be required to return Timber and Tundra to Black Hawk pending the outcome of this case.

## III. CONCLUSION

Although the state has a compelling interest in preventing the spread of rabies, the Department of Health has failed to show, under the circumstances of this case, that immediate destruction of Mr. Black Hawk's bear is warranted. As Dr. Lurie herself testified, had Ling the panda bit her zookeeper, the animal would not be euthanized because she is too valuable an animal and too rare to destroy for the purpose of a rabies test. Instead, the zookeeper would just be provided the post exposure rabies treatment. The circumstances of this case suggest that Tundra, Mr. Black Hawk's female bear, is as valuable and irreplaceable to him and his ability to practice his religious beliefs as is Ling Ling to the public.

Since the defendants have not offered an explanation as to why Black Hawk's exception request was denied, Black Hawk may reasonably be able to succeed on the merits. Additionally, Black Hawk has demonstrated that the harm posed by the destruction of the bear is irreversible. Accordingly, his request for a preliminary injunction to prevent the Game Commission from destroying Tundra in accordance with the DOH regulation will be granted.