

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-2004

# Blackhawk v. Comm PA

Precedential or Non-Precedential: Precedential

Docket No. 02-3947

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Blackhawk v. Comm PA" (2004). *2004 Decisions.* Paper 364.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/364

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

Nos. 02-3947/4158

DENNIS L. BLACKHAWK

v.

COMMONWEALTH OF
PENNSYLVANIA;
PENNSYLVANIA GAME
COMMISSION; VERNON ROSS,
Director;
THOMAS R. LITTWIN, Law Enf.
Director; FREDERICK
MERLUZZI, Enf. Officer; BARRY
HAMBLEY; DAVID E. OVERCASH,
in their individual and official capacities

Vernon Ross
Thomas Littwin
David E. Overcash,

Appellants, No. 02-3947
_____

DENNIS L. BLACKHAWK,

Appellant, No. 02-4158

v.

COMMONWEALTH OF
PENNSYLVANIA; PENNSYLVANIA

GAME COMMISSION;
VERNON ROSS, Director; THOMAS
R. LITTWIN, Law Enf. Director;
FREDERICK MERLUZZI, Enf. Officer;
BARRY HAMBLEY;
DAVID E. OVERCASH, in their
individual and official
capacities;

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF
PENNSYLVANIA

(Dist. Court No. 99-cv-02048)
District Court Judge: Hon. Thomas I.
Vanaskie

Argued: July 21, 2003

Before: ALITO and FUENTES, <u>Circuit
Judges</u>, and SURRICK,[*] <u>District Judge</u>.

(Opinion Filed: August 20, 2004 )

D. MICHAEL FISHER
HOWARD G. HOPKIRK (Argued)
CALVIN R. KOONS
JOHN G. KNORR, III
Office of Attorney General
Appellate Litigation Section
15th Floor, Strawberry Square

[*] The Hon. R. Barclay Surrick,
United States District Judge for the
Eastern District of Pennsylvania, sitting by
designation.

Harrisburg, Pa. 17120

*Counsel for Appellants/Cross-Appellees*

GARY S. GILDIN (Argued)
150 South College Street
Carlisle, Pa. 17013

THOMAS B. SCHMIDT, III
PEPPER HAMILTON LLP
200 One Keystone Plaza
North Front and Market Streets
Post Office Box 1181
Harrisburg, Pa. 17108-1181

*Counsel for Appellee/Cross-Appellant*

---

OPINION OF THE COURT

ALITO, Circuit Judge:

This is an appeal by officials of the Pennsylvania Game Commission from an order permanently enjoining them from enforcing a permit fee provision of the state Game and Wildlife Code against Dennis Blackhawk on the ground that the Commission's current waiver policy violates his right to the free exercise of religion. Blackhawk in turn cross-appeals the District Court's holding that the Game Commission officials are not personally liable for violating his rights. We affirm the District Court in both respects.

I.

Lakota Indians believe that black bears protect the Earth, sanctify religious ceremonies, and imbue worshipers with spiritual strength. Although Blackhawk is a Lenape Indian by birth, he was adopted by elders of the Oglala Lakota and Seneca tribes, who schooled him in the religious traditions of the Lakota and Iroquois people. When Blackhawk began to see bears in a recurring dream, Lakota tribal elders concluded that the dream was a prophesy and predicted that Blackhawk would derive spiritual power from the animals.

In 1994, Blackhawk purchased two black bear cubs, a male and a female named Timber and Tundra. He moved to Pennsylvania in 1995 and began conducting religious ceremonies with the bears on his property. Members of various American Indian tribes visit Blackhawk from across the country to participate in these rituals. Due to Blackhawk's stewardship of the bears and his role in these ceremonies, some consider him to be a holy man.

The Pennsylvania Game and Wildlife Code requires permits in order to engage in a variety of different activities, including such things as bird banding (34 Pa. Cons. Stat. Ann. § 2921), falconry (34 Pa. Cons. Stat. Ann. § 2925), various types of field dog trials (34 Pa. Cons. Stat. Ann. § 2943), fox chasing (34 Pa. Cons. Stat. Ann. § 2945), maintaining a "menagerie" (34 Pa. Cons. Stat. Ann. § 2964), and either dealing in or possessing "exotic wildlife." 34 Pa. Cons. Stat. Ann. §§ 2962, 2963. Annual fees ranging from $25 to $300 are collected for these permits, see 34 Pa. Cons. Stat. Ann. § 2904, and the revenues from all of these fees comprise

about one percent of the Game Commission's annual intake.

Although persons wishing to keep wildlife in captivity must generally obtain a menagerie or exotic wildlife possession permit and pay the requisite fee, see 34 Pa. Cons. Stat. Ann. §§ 2904, 2964(c)(1), the Code excludes from these requirements most zoos and all "[n]ationally recognized circus[es]." 34 Pa. Cons. Stat. Ann. § 2965(a)(1)–(3). In addition, the director of the Game Commission is authorized to waive a permit fee "where hardship or extraordinary circumstance warrants," so long as the waiver is "consistent with sound game or wildlife management activities or the intent of [the Game and Wildlife Code]" 34 Pa. Cons. Stat. Ann. § 2901(d).

From 1995 to 1999, Blackhawk obtained permits to own the bears. At first, he acquired a "menagerie permit," but bears are classified under the Game and Wildlife Code as "exotic wildlife," see 34 Pa. Cons. Stat. Ann. § 2961, and special permits are required for those wishing to deal in or possess exotic wildlife. See 34 Pa. Cons. Stat. Ann. §§ 2904, 2962, 2963. Beginning in 1997, the Game Commission insisted that Blackhawk obtain an exotic wildlife dealer permit, which costs $200 per year, see 34 Pa. Cons. Stat. Ann. § 2904, because Frederick Merluzzi, a wildlife conservation officer, believed that Blackhawk intended to breed the bears and sell their cubs. If Blackhawk did not wish to deal in bears but merely to keep them, he needed only an exotic wildlife possession permit, for which the annual fee is $50. See 34 Pa. Cons. Stat. Ann. § 2904.

In 1998, Blackhawk sought an exemption from the permit fee on the ground that he possessed the bears for Native American religious purposes. After making an inquiry to the Bureau of Indian Affairs, Merluzzi informed Blackhawk that Native Americans who possess a Bureau of Indian Affairs identification card are entitled to some exemptions under federal law, but Blackhawk did not possess such a card. Blackhawk paid the 1998 fee under protest after citing his religious purpose and alleging financial hardship. He then wrote to his representative in the state legislature, Keith McCall, and McCall intervened and asked Commission director Vernon Ross to oversee the situation personally. On October 6, 1999, Blackhawk received a letter from Commission officials Thomas Littwin and David Overcash informing him that he did not qualify for a waiver under 34 Pa. Cons. Stat. Ann. § 2901(d) because the Commission regarded the keeping of wild animals in captivity as inconsistent with sound game and wildlife management activities unless the animals were intended for release into the wild. Since Timber and Tundra had been declawed and had been kept in captivity their entire lives, they could not be released into the wild. "Thus, in the Commission's view, Blackhawk [was] not entitled to an exemption regardless of his financial circumstances." Black Hawk v. Pennsylvania, 225 F. Supp. 2d 465, 470 (M.D. Pa. 2002). The letter from Littwin

and Overcash told Blackhawk that, because his permit had expired on June 30, 1999, if he still possessed the bears he was subject to prosecution.

Blackhawk responded by again requesting a waiver, and in November of 1999, Merluzzi filed criminal charges against Blackhawk for failing to renew.

Blackhawk filed an action under 42 U.S.C. § 1983, seeking to enjoin the Game Commission from assessing the fee or confiscating the bears and also seeking money damages from Merluzzi, Overcash, Littwin, Hambley, and Ross. Prior to the District Court's disposition of the case, a state magistrate found Blackhawk guilty of the criminal charges and assessed a $178,400 fine, which he later reduced to $6,442. However, the Court of Common Pleas stayed the criminal case pending a ruling on Blackhawk's § 1983 action.

In August of 2000, Blackhawk discovered that the bears' enclosure had been vandalized, that the locks on the enclosure had been cut, and that the animals were missing. A neighbor encountered Tundra on his property and was attempting to lead the bear back to the pen when Tundra bit him. The neighbor alerted the Game Commission, which tracked the bears and tranquilized them. An official who was attempting to restrain Tundra was also bitten by the bear, but the Commission succeeded in taking both bears into custody. It then sought to destroy the bears pursuant to a regulation requiring wild animals who have bitten humans to be decapitated in order to be tested for rabies. See 28 Pa. Code § 27.103(f)(2). The District Court enjoined the Commission from destroying the bears and ordered their return. See Black Hawk v. Pennsylvania, 114 F. Supp. 2d 327 (M.D. Pa. 2000).

When the District Court reached the merits of the civil case, it held that the Game Commission's refusal to exempt religiously motivated activities from the permit fee violated the First Amendment's Free Exercise Clause. See Black Hawk, 225 F. Supp. 2d at 465. The Court held that the permit fee requirement was not a "'valid and neutral law of general applicability'" under Employment Div., Dep't of Human Resources of Oregon v. Smith, 494 U.S. 872, 879 (1990), because the statutory waiver established a "'system of individualized exceptions.'" Black Hawk, 225 F. Supp. 2d at 473. The Court accordingly applied strict scrutiny to the waiver scheme, id. at 472–73, and held that the scheme could not withstand strict scrutiny because the Commission was unable to "demonstrate a compelling interest in refusing to grant a religious exemption." Id. at 477. The District Court accordingly enjoined the Game Commission from charging Blackhawk a permit fee. However, the Court declined to hold the individual defendants liable under § 1983 because it found that Merluzzi and Hambley were not personally responsible for violating Blackhawk's rights and that Ross, Littwin, and Overcash were entitled to qualified immunity.

On appeal, the Commission argues

-4-

that the First Amendment does not entitle Blackhawk to a waiver, and Blackhawk contends that the District Court erred in granting summary judgment in favor of the individual defendants. We exercise plenary review over a grant of summary judgment, Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 87–88 (3d Cir. 2000), and likewise review de novo the District Court's interpretation of the Constitution. United States v. Scarfo, 263 F.3d 80, 91 (3d Cir. 2001).

## II.

## A.

Blackhawk's free exercise claim requires us to apply the Supreme Court's decisions in Employment Div., Dep't of Human Resources of Oregon v. Smith, supra, and Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520 (1993) ("Lukumi"), and our decisions in Fraternal Order of Police v. City of Newark, 170 F.3d 359 (3d Cir. 1999) ("Fraternal Order of Police"), and Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144 (3d Cir. 2002) ("Tenafly"). Based on these decisions, we agree with the District Court that Blackhawk's free exercise rights were violated.

In Smith, the Supreme Court opened a new chapter in the interpretation of the Free Exercise Clause. The Court began by reaffirming the principle that the Clause prohibits "all 'governmental regulation of religious *beliefs* as such.'" 494 U.S. at 877 (quoting Sherbert v. Verner, 374 U.S. 398, 402 (1963)) (emphasis in Sherbert). The Court held,

however, that most laws that burden religiously motivated *conduct* stand on a different footing. Rejecting the argument that such laws must generally satisfy strict scrutiny, the Court concluded that the First Amendment is not ordinarily offended by "neutral" and "generally applicable" laws that merely have "the incidental effect" of burdening religiously motivated conduct. 494 U.S. 878, 879, 881.

The Court recognized several exceptions to this rule. First, the Court did not overrule prior decisions in which "hybrid claims" (i.e., claims involving "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections") had prevailed against "neutral, generally applicable law[s]." Id. at 881 (citations omitted). Nor did the Court overrule Sherbert and other decisions that "invalidated state unemployment compensation rules that conditioned the availability of benefits upon an applicant's willingness to work under conditions forbidden by his religion." Id. at 883. Finally, the Court observed that even if it "were inclined to breathe into Sherbert some life beyond the unemployment field, [the Court] would not apply it to require exemptions from a generally applicable criminal law." Id. at 884. The Court wrote:

> The Sherbert test, it must be recalled, was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct. . . .

[O]ur decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason.

Id. at 884 (citation omitted).

In Lukumi, the Court applied Smith to a web of city ordinances that interfered with the practice of Santeria, a religion that employs the sacrifice of animals in its rituals. The ordinances prohibited the killing of animals in Santeria rituals but excluded almost all other animal killings, including killings that occurred in connection with hunting, fishing, meat production, pest extermination, euthanasia, and the use of rabbits to train greyhounds. Id. at 536-37. The Court held that these "gerrymandered" ordinances were neither "neutral" nor "generally applicable," id. at 533-46, and that they could not withstand strict scrutiny. Id. at 546-47.

The Lukumi Court's discussion of the requirement of general applicability is particularly important for present purposes. While the Court did not attempt to "define with precision the standard used to evaluate whether a prohibition is of general application," id. at 543, the Court's discussion of the requirement is

instructive. The principal ordinances challenged in Likumi were claimed to advance two interests – preventing cruelty to animals and protecting public health -- but the Court concluded that the ordinances failed the general applicability standard because they were "underinclusive for [their asserted] ends" and "[t]he underinclusion [was] substantial, not inconsequential." Id. at 543. The Court explained that the ordinances were "underinclusive" because they "fail[ed] to prohibit nonreligious conduct that endanger[ed] these interests in a similar or greater degree than Santeria sacrifice does." Id. The Court added:

The ordinances "ha[ve] every appearance of a prohibition that society is prepared to impose upon [Santeria worshippers] but not upon itself." . . . This precise evil is what the requirement of general applicability is designed to prevent.

Id. at 545-46 (quoting Florida Star v. B.J.F., 491 U.S. 524, 542 (1989) (Scalia, J. concurring in part and concurring in judgment).

Applying these precedents, we held in Fraternal Order of Police that the Free Exercise Clause was violated by a city's practice of prohibiting police officers from wearing beards for religious reasons but allowing officers to wear beards for medical reasons. See 170 F.3d at 364-67. In reaching this conclusion, we drew on

both the Court's discussion of "individualized exemptions" and the general applicability requirement. Id. at 364-66. We explained that a system that permits individualized, discretionary exemptions provides an opportunity for the decision maker to decide that "secular motivations are more important than religious motivations" and thus to give disparate treatment to cases that are otherwise comparable. 170 F.3d at 365. "If anything," we stated, "this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection." Id. Concluding that the policy in question was suspect for precisely this reason, we wrote:

> [T]he medical exemption raises concern because it indicates that the Department has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not. . . . [W]hen the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny.

Id. at 366. We therefore applied strict scrutiny and held that the no-beards policy could not satisfy that standard. Id. at 366-67.

In Tenafly, we considered a local ordinance that was neutral and generally applicable on its face but that had been enforced in a discriminatory manner. See 309 F.3d at 167-72. The ordinance banned the placement of any "'sign or advertisement, or other matter upon any pole, tree, curbstone, sidewalk or elsewhere, in any public street or public place, excepting such as may be authorized by this or any other ordinance of the Borough.'" 309 F.3d at 151 (citation omitted). The local government, however, had permitted the placement on utility poles of many types of signs and symbols, including house number signs, signs pointing the way to area churches, lost animal signs, holiday symbols, and orange ribbons signifying opposition to school regionalization. Id. at 151. By contrast, the local government refused to permit Orthodox Jews to place *lechis* on utility poles in order to construct an *eruv*, a ceremonial demarcation of an area within which Orthodox Jews may push or carry objects on the Sabbath. Id. at 152. We thus held that "the Borough's selective, discretionary application of [the ordinance] violates the neutrality principle of Lukumi and Fraternal Order of Police because it 'devalues' Orthodox Jewish reasons for posting items on utility poles by 'judging them to be of lesser import than nonreligious reasons,' and thus 'single[s] out' the plaintiffs' religiously

-7-

motivated conduct for discriminatory treatment." Id. at 168 (quoting Lukumi, 508 U.S. at 537, and Fraternal Order of Police, 170 F.3d at 364-65 (footnote omitted)).

The teaching of Smith, Lukumi, Fraternal Order of Police, and Tenafly may be summarized as follows. The Free Exercise Clause forbids any regulation of beliefs as such. See Lukumi, 508 U.S. at 533; Smith, 494 U.S. at 877. On the other hand, with the exceptions noted above, a "neutral" and "generally applicable" law that burdens conduct regardless of whether it is motivated by religious or secular concerns is not subject to strict scrutiny. See Lukumi, 508 U.S. at 546; Smith, 494 U.S. at 878. A law is "neutral" if it does not target religiously motivated conduct either on its face or as applied in practice. See Lukumi, 508 U.S. at 533-40; Tenafly, 309 F.3d at 167. A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated. Lukumi, 508 U.S. at 543-46; Fraternal Order of Police, 170 F.3d at 364-66. If a law burdening religiously motivated conduct is not neutral and generally applicable it must satisfy strict scrutiny. See Lukumi, 508 U.S. at 546; Smith 494 U.S. at 878. Accordingly, it must serve a compelling government interest and must be narrowly tailored to serve that interest. Lukumi, 508

U.S. at 546. Similarly, a law must satisfy strict scrutiny if it permits individualized, discretionary exemptions because such a regime creates the opportunity for a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against religiously motivated conduct. Lukumi, 508 U.S. at 537; Smith, 494 U.S. at 884, Fraternal Order, 170 F.3d at 364-65.

B.

The fee requirement at issue here fails the general applicability requirement for two reasons. First, the Game Code creates a regime of individualized, discretionary exemptions that is not materially distinguishable from those that triggered strict scrutiny in the unemployment compensation cases. Under the laws involved in those cases, benefits were generally denied if a person had quit or refused work, but individualized exemptions were available for persons who had quit or refused work for "good cause." See Smith, 494 U.S. at 884. Under 34 Pa. Cons. Stat. Ann. § 2901(d), a person may obtain a waiver from the fee requirement if the person shows "hardship" or "extraordinary circumstances" and the waiver is consistent with "sound game or wildlife management activities or the intent of [the Game and Wildlife Code]." Blackhawk does not claim that he is entitled to an exemption from the "hardship" requirement, and the regulation's remaining requirements – consistency with sound game or wildlife management activities or the intent of Code – are

-8-

sufficiently open-ended to bring the regulation within the individualized exemption rule.

The Commonwealth contends, however, that the regulation categorically rules out waivers for persons, like Blackhawk, who wish to keep animals for religious reasons. This is so, the Commonwealth maintains, because keeping animals for religious reasons is not consistent with state wildlife policy. In support of this argument, the Commonwealth relies on the following passage from the declaration of a Game Commission official:

> The Legislature has delegated the Game Commission the responsibility to "protect, propagate, manage and preserve the game or wildlife of this Commonwealth." 34 Pa. C.S. § 321. The Game Commission *normally* considers the keeping of live animals in captivity as being inconsistent with sound game and wildlife management, or the overall purpose of the Game Code. This is because *in general* keeping animals in captivity does not provide any positive benefit to the welfare of populations of wildlife which live in their natural state within the Commonwealth. The only exception would be where such activity is done with the intent of reintroducing those animals - or their offspring - into the wild; the animals are members of an endangered species; or the keeping of the animals in captivity provides *some other tangible benefit for the welfare and survival of Pennsylvania's existing wildlife population.*

App. 121-22 (emphasis added).

This passage is insufficient to show that 34 Pa. Cons. Stat. Ann. § 2901(d) does not create a regime of discretionary, individualized exemptions under which Blackhawk might qualify if his conduct were not religiously motivated. The italicized phrases show that the Game Commission's policy does not categorically disfavor the keeping of wild animals in captivity. Although the declaration suggests that the keeping of wild animals is inconsistent with state wildlife policy unless doing so provides a "tangible benefit" for the state's wild animals, this is hardly a self-defining concept, and the Commonwealth has not explained what the concept means.

Moreover, under 34 Pa. Cons. Stat. Ann. § 2901(d), a person seeking a waiver need not show that the waiver would be "consistent with sound game or wildlife management activities." Instead, a person seeking a waiver may show that it would be "consistent with . . . the intent of [the Game and Wildlife Code]," id., and the Code clearly does not embody a firm or uniform policy against keeping wild animals in captivity. For one thing, it allows anyone to keep wild animals if they pay a $50 or $100 fee. See 34 Pa. Cons. Stat. Ann. § 2904. These modest fees, which are comparable to many municipal dog license fees, can hardly be viewed as expressing a hard policy against the keeping of wild animals. Furthermore, the Code provides categorical exemptions from the fee requirement for entities such as zoos and "nationally recognized circuses." See 34 Pa. Cons. Stat. Ann. § 2965(a)(1)-(3). These exemptions serve the Commonwealth's interests in promoting commerce, recreation, and education, and consequently, a waiver that furthered these or analogous interests might be viewed as consistent with the Code's intent. In sum, then, the waiver mechanism set out in 34 Pa. Cons. Stat. Ann. § 2901(d) creates a regime of individualized, discretionary exemptions that triggers strict scrutiny.

The categorical exemptions in 34 Pa. Cons. Stat. Ann. § 2965(a) for zoos and "nationally recognized circuses" likewise trigger strict scrutiny because at least some of the exemptions available under this provision undermine the interests served by the fee provision to at least the same degree as would an exemption for a person like Blackhawk.

The Commonwealth suggests that the fee requirement serves two main interests: it brings in money and it tends to discourage the keeping of wild animals in captivity, which, as noted, the Commonwealth generally views as undesirable. As the Commonwealth's brief puts it, "'in general keeping animals in captivity does not provide any positive benefit to the welfare of populations of wildlife which live in their natural state within Pennsylvania." Appellants' Br. at 12.

The exemptions for "nationally recognized circuses" and zoos work against these interests to at least the same degree as the type of exemption that Blackhawk seeks. The state's interest in raising money is undermined by any exemption, and the Commonwealth has not argued, much less shown, that religiously based exemptions, if granted, would exceed the exemptions for qualifying zoos and circuses and individual waivers under 34 Pa. Cons. Stat. Ann. § 2901(d) for persons with secular motivations.

The exemptions for nationally recognized circuses and zoos also work against the Commonwealth's asserted goal of discouraging the keeping of wild animals in captivity except where doing so provides a "tangible" benefit for Pennsylvania's wildlife. The Commonwealth has not explained how

-10-

circuses, whether nationally recognized or not, provide tangible benefits for animals living in the wild in Pennsylvania. Similarly, except in special circumstances (for example, if a zoo is conducting research on animals that are indigenous to Pennsylvania or is raising animals to be released into the wild in Pennsylvania), it is difficult to see how the activities of a zoo provide a tangible benefit for Pennsylvania's wild animals. Yet under the statute noted above, all zoos are exempted. Accordingly, the challenged fee provisions are substantially "underinclusive" with respect to its asserted goals, and they thus fail the requirement of general applicability.

The Commonwealth contends that the exemptions for circuses and zoos are "analogous to the prescription exception in Smith and the undercover uniform exception" in Fraternal Order of Police, but this argument is flawed. Appellants' Br. at 24 (footnote omitted). In Smith, the state law prohibited the knowing or intentional possession of a controlled substance unless the substance was prescribed by a doctor. See 494 U.S. at 874. The purpose of drug laws is to protect public health and welfare. See id. at 904 (O'Connor, J., concurring in the judgment). However, when a doctor prescribes a drug, the doctor presumably does so to serve the patient's health and in the belief that the overall public welfare will be served. Therefore, the prescription exception in Smith did not undermine the purpose of the state's drug laws. The same is true of the undercover exception in Fraternal Order of Police. There, police officers were prohibited from wearing beards so that they would all present the same general image to the public. Since officers working undercover are not perceived by the public as police officers, allowing undercover officers to wear beards did not undermine the purpose of the no-beard policy. See Fraternal Order, 170 F.3d at 366. As explained above, however, the exemptions for circuses and zoos work against both of the interests that the permit fee is said to serve.

C.

In arguing that the fee provision should not be subjected to strict scrutiny, the Commonwealth takes the position that the fee does not violate Blackhawk's free exercise rights because it does not prohibit him from engaging in religiously motivated conduct but merely obligates him to pay a modest annual fee. The Commonwealth suggests that many laws imposing user fees and other similar fees would be thrown into disarray if every person claiming a religious objection to a fee could obtain a waiver. The Commonwealth further argues that, if it granted waivers for persons who keep wild animals for religious reasons, it would be required under the Establishment Clause to grant comparable waivers for persons who wish to keep such animals for secular reasons.

These arguments ignore the content of the statutes that are before us. We are not presented here with a neutral and generally applicable user fee that is

-11-

uniformly imposed without allowing individualized exemptions. Under Smith, such a scheme (barring the applicability of one of the exceptions noted above) would not trigger strict scrutiny, and a person seeking to be excused from paying the fee on religious grounds would be unlikely to prevail. Here, by contrast, we are confronted with a scheme that features both individualized and categorical secular exemptions, and it is these that trigger strict scrutiny. Moreover, because the state statute permits individualized exemptions for entirely secular reasons, we see no plausible ground on which it could be argued that the Establishment Clause precludes equal treatment for persons who wish to keep animals for religious reasons.

The Commonwealth also misapprehends the nature of Blackhawk's claim. Blackhawk did not ask for a waiver simply because he possessed the bears for religious reasons. Rather, he asked for a waiver "because of his Native American beliefs *and* because the fee would cause [him] hardship." 225 F. Supp. 2d at 470 (emphasis added). In addition, the Commission did not deny the waiver on the ground that Blackhawk did not establish financial hardship. Instead, the Commission concluded that "Blackhawk would not be entitled to an exemption *regardless of his financial circumstances*." Id. (emphasis added). Thus, although the Commonwealth argues at some length that Blackhawk could scrape together the money to pay the fee, that question is not before us. Finally, the Commonwealth argues that the fee provisions at issue here

are similar to provisions of the Internal Revenue Clause involved in Adams v. C.I.R., 170 F.3d 173 (3d Cir. 1999). In Adams, a taxpayer did not pay taxes because she had a religious objection to the use of tax revenue for miliary purposes, and the IRS assessed deficiencies and penalties against her. Id. at 174-75. The taxpayer argued that requiring her to pay taxes substantially burdened her free exercise of religion and violated a provision of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1, which remained applicable to the federal government despite City of Boerne v. Flores, 521 U.S. 507 (1997). See 170 F.3d at 175. Under RFRA, a law that substantially burdens the exercise of religion must represent the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000bb-1. Looking to pre-Smith cases involving free exercise challenges to the collection of taxes, Adams held that the RFRA standard was met. 175 F.3d at 175-80. The Adams panel then rejected the taxpayer's argument that she had met the statutory requirements needed to avoid penalties and additions to tax. See id. at 180-81. Under the Internal Revenue Code, these penalties and additions could be avoided if the taxpayer showed "reasonable cause" or "unusual circumstances and unfairness." See 26 U.S.C. § 6651(a) (no penalty for failure to file if taxpayer demonstrates "reasonable cause"); 26 U.S.C. § 6654(e)(3) (no addition for underpayment of estimated tax where failure is due to "unusual circumstances" and addition would be

-12-

"against equity and good conscience"). Invoking a "well established line of cases involving challenges to the collection of taxes on religious grounds," 170 F.3d at 181, the panel held in the body of its opinion that the taxpayer was ineligible for relief under the provisions on which she relied. Id. Then, in a footnote, Adams quickly rejected the taxpayer's contention that these provisions created a mechanism for individual exemptions similar to that in the unemployment compensation cases and that "the failure to extend those exemptions to a case of religious hardship constitute[d] discrimination on the basis of religious belief." Id. at 181 n.10. Adams held that the provisions of the Internal Revenue Code on which the taxpayer relied did not create a scheme of individual exemptions under which she might have qualified if she had refused to file for secular, as opposed to religious, reasons. Id. On the contrary, as previously noted, Adams held that these provisions are categorically inapplicable to the taxpayer for facially neutral reasons. Id.

The Adams footnote stands for the proposition that the free exercise rule regarding individual exemptions does not apply if the class of persons who may seek such an exemption is defined in facially neutral terms and the person challenging the scheme does not fall within that class. In that situation, the person challenging the scheme must argue instead that the scheme fails the requirement of general applicability because exempting the class of persons who fall within the statutory exemption undermines the statute's goals

to at least the same degree as would an exemption for those in the class of the person mounting the challenge. The Adams footnote did not go on to address this latter argument, but in any event the argument was doomed by the panel's discussion of the RFRA issue. The panel's discussion of that issue made it clear that the relevant Code provisions met strict scrutiny because they served a compelling interest ("the 'uniform, mandatory participation in the Federal income tax system,'" 170 F.3d at 178 (citation omitted), and were narrowly tailored to serve that interest in the sense relevant in this context. See id. at 179-80.

Properly understood, therefore, the Adams footnote does not support the Commonwealth's position here. In this case, as previously explained, 34 Pa. Cons. Sat. Ann. § 2901(d) does not categorically exclude persons wishing to keep animals for religious reasons. In addition, 34 Pa. Cons. Stat. Ann. § 2965(a)(1)-(3) contains secular exemptions that preclude the fee scheme from satisfying the requirement of general applicability. As a result, the fee provisions must satisfy strict scrutiny.

III.

In order to survive strict scrutiny, the fee scheme "must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." Lukumi, 508 U.S. at 546 (internal quotation marks omitted). In this case, the Game Commission asserts that the fee scheme serves two compelling interests: (1) "promot[ing] the welfare and

prosperity of wildlife populations" and (2) "maintaining the fiscal integrity of its permit fee system." Appellants' Br. at 28.

It is doubtful that these interests qualify as compelling. In Lukumi, 508 U.S. at 546-47, the Court held that "[w]here government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling." Here, the fee scheme has precisely this flaw. Denying fee exemptions to otherwise qualified persons who wish to keep animals for religious reasons may produce a small decrease in the total number of wild animals held in captivity, but if the Commonwealth regarded it as a matter "of the highest order" to reduce the number of wild animals in captivity, it could do much more. For one thing, it could increase the fees for menagerie and exotic wildlife possession permits, now set at $100 and $50 per year respectively, to levels that would provide a substantial disincentive for those who are not poor. Similarly, if the Commonwealth believes that persons who cannot afford a $100 or $50 annual permit fee should not keep wild animals because such persons are likely to find it difficult to provide adequate care for the animals, the Commonwealth could do away with all "hardship" waivers. Because the Commonwealth sets its fees at modest levels and provides for "hardship" waivers, the Commonwealth clearly does not regard the objective of discouraging the possession of wild animals as a matter "of the highest order."

Much the same is true with respect to the Commonwealth's asserted interest in the financial integrity of the fee system. Because the Commonwealth makes waivers available for persons seeking to keep animals for secular reasons, the Commonwealth plainly does not regard waivers as a great threat.

Furthermore, even if the Commonwealth's asserted interests are compelling, the fee scheme is not narrowly tailored to further them. If the Commonwealth wishes to reduce the number of wild animals held in captivity or to reduce the number held by persons who cannot afford a $100 or $50 annual fee (and these are the only effects that denying the exemptions at issue can have), the scheme is substantially underinclusive for the reasons already set out. As a result, the scheme cannot satisfy strict scrutiny.

We therefore affirm the injunction issued by the District Court.

IV.

We proceed to address the question of the individual defendants' liability for money damages. The District Court granted summary judgment to Merluzzi and Hambley on the ground that they "did not participate in the decision to deny Black Hawk an exemption" and did not "'direct[] others to violate'" his rights. Black Hawk, 225 F. Supp. 2d at 479 (brackets in original). The Court excluded Ross, Littwin, and Overcash from this

-14-

analysis, because Ross "had 'actual knowledge' and acquiesced in the decision to deny Black Hawk an exemption," and because Littwin and Overcash conceded that they "were personally involved in the decision to deny Black Hawk an exemption." Id. (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) (holding that supervisor liability can be established "'through allegations of personal direction or of actual knowledge and acquiescence'") (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988))). Nevertheless, the Court determined that all three remaining individual defendants were entitled to qualified immunity.

We hold that all of the defendants were entitled to qualified immunity, and we therefore affirm the order of the District Court on this basis. A government officer defendant sued for a constitutional violation is entitled to qualified immunity if a reasonable officer could have believed that the challenged conduct was lawful under the circumstances. Anderson v. Creighton, 483 U.S. 635, 641 (1987). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). See also Saucier v. Katz, 533 U.S. 194, 202 (2001).

In this case, the governing precedents were complex and developing. Although we now hold that the waiver procedure in 34 Pa. Cons. Stat. Ann. § 2901(d) is sufficiently open-ended to constitute a system of individual exemptions, a reasonable officer in the position of the defendants could have concluded otherwise. Section 2901(d) is more structured than the unemployment compensation statutes, which permitted exemptions for "good cause," see Smith, 494 U.S. at 884, and a reasonable officer could have viewed § 2901(d) as analogous for present purposes to the Internal Revenue Code provisions that Adams held did not provide for individual exemptions. See 170 F.3d at 181 n.10.

The meaning of the general applicability principle was also not clearly developed in the governing cases at the time in question. Smith did not explain how to identify laws that fail the test, and Lukumi, while providing useful guidance, explicitly disclaimed any intention of "defin[ing] with precision . . . whether a prohibition is of general application." 508 U.S. at 543. Moreover, our decisions on March 3 and 4, 1999, in Fraternal Order of Police and Adams could have reasonably been interpreted as sending conflicting signals. As just discussed, the provisions of the Internal Revenue Code at issue in Adams could have been reasonably regarded as similar to the provisions of the Pennsylvania Game and Wildlife Code involved here, but we held that the Internal Revenue Code provisions did not create a regime of individual exemptions. The previous day, in Fraternal Order of Police, we had explained that the individual exemption rule is simply one application of the broader general-applicability requirement. See 170 F.3d at 365-66. Thus, reading Adams in light of Fraternal

-15-

Order of Police, a reasonable officer could have been led to read <u>Adams</u> as holding that the Internal Revenue Code provision also satisfied the general applicability requirement. Not surprisingly, <u>Adams</u> is a centerpiece of the Commonwealth's argument in this appeal in support of the constitutionality of the denial of Blackhawk's waiver request. Although we find <u>Adams</u> to be distinguishable for the reasons explained above, a reasonable officer in the position of the defendants, after reviewing <u>Adams</u> and the other leading cases that had been decided at the time, could have concluded that the denial was constitutional.

## IV.

After considering all of the arguments raised in the appeal and cross-appeal, we affirm the judgment of the District Court in all respects.